

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-19-00390-CV

———————————————————

IN THE INTEREST OF G.S., A CHILD

On Appeal from the 231st District Court
Tarrant County, Texas
Trial Court No. 231-601747-16

Before Sudderth, C.J.; Womack and Wallach, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

## I. Background

This is a private termination-of-parental-rights case. Two days before G.S. was born, pro se Appellant Father was convicted of aggravated robbery, a first-degree felony, and sentenced to ten years' confinement. After G.S. tested positive for methamphetamine at his birth, his mother asked T.S. to take care of him because she knew the Department of Family and Protective Services (DFPS) was likely to become involved, and T.S. had previously adopted her older son, G.S.'s half-sibling, through the foster system. Half a year later, Father sought a DNA test for a determination of paternity, and he repeatedly asked that G.S. be placed with his brother.[1]

T.S. became G.S.'s sole managing conservator on October 16, 2017, pursuant to an agreement with Father and G.S.'s birth mother. T.S. filed a petition to terminate the parent–child relationship as to both parents on May 8, 2018.[2] As to Father, T.S. alleged, among other grounds, that he had abandoned G.S. or had knowingly engaged in criminal conduct resulting in his conviction and confinement for not less than 2 years from the date the petition was filed and that termination of his parental rights was in G.S.'s best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(A)–(C), (Q), (2).

---

[1]Father's brother also sought custody but lacked standing.

[2]G.S.'s mother voluntarily relinquished her parental rights.

2

Father's parental rights were terminated after a trial in which the trial court found by clear and convincing evidence that he had voluntarily left the child alone or in the possession of another not the parent and expressed an intent not to return; that he had knowingly engaged in criminal conduct that resulted in his conviction of an offense and confinement or imprisonment and inability to care for the child for not less than two years from the date the petition was filed; and that termination of Father's parental rights to G.S. was in G.S.'s best interest. *See id.* § 161.001(b)(1) (A), (Q), (2).

Father, who was incarcerated at the time of the termination trial and remains incarcerated, argues on appeal that his due process rights were violated[3] and that the criminal conduct that resulted in his incarceration occurred before G.S. was conceived; we interpret his argument as a challenge to the legal and factual sufficiency of the evidence.[4] He also argues that the trial court was biased against him.[5] We affirm.

---

[3]Due process demands the heightened standard of clear and convincing evidence because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *In re E.R.*, 385 S.W.3d 552, 555 (Tex. 2012) (quoting *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982)); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see also In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012).

[4]Father raises a variety of arguments in the first 16 pages of his brief, *cf.* Tex. R. App. P. 38.1(f), and he complains about deficiencies in the record. The remaining 254 pages of his brief are various "exhibits" attached by Father. To the extent these exhibits are not also contained within the appellate record, we may not consider them. *Murphy v. Leveille*, No. 02-08-00130-CV, 2009 WL 2619857, at *2 n.3 (Tex. App.—

## II. Motion to Recuse

We review an order denying a motion to recuse for an abuse of discretion. Tex. R. Civ. P. 18a(j)(1)(A). A trial court abuses its discretion if it acts without reference to any guiding rules or principles—that is, if its act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). We cannot conclude that an abuse of discretion occurred merely because we would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995); *see also Low*, 221 S.W.3d at 620.

A motion to recuse must be verified, must assert one or more of the grounds listed in Rule of Civil Procedure 18b, must not be based solely on the judge's rulings in the case, and must state facts, with detail and particularity, that are within the affiant's personal knowledge (although facts may be stated on information and belief

---

Fort Worth Aug. 26, 2009, no pet.) (per curiam) (mem. op.) (stating that the court must hear and determine a case based on the record as filed and may not consider documents attached as exhibits to briefs); *see* Tex. R. App. P. 34.1 ("The appellate record consists of the clerk's record and, if necessary to the appeal, the reporter's record."); *see also* Tex. R. App. P. 34.5(a) (setting out required contents of the clerk's record "[u]nless the parties designate the filings in the appellate record by agreement under Rule 34.2"), (b) (setting out how to request the inclusion of additional items in the clerk's record), (c) (setting out how to supplement the clerk's record).

[5]Father also argues that he never voluntarily abandoned G.S. and that evidence of his incarceration is insufficient to support a finding of child endangerment, but based on our resolution below, we do not reach these arguments. *See* Tex. R. App. P. 47.1.

if the basis for that belief is specifically stated), that would be admissible in evidence, and that, if proven, would be sufficient to justify recusal. Tex. R. Civ. P. 18a(a)(1)–(4).

Rule of Civil Procedure 18b states that a judge must recuse in any proceeding in which: (1) the judge's impartiality might reasonably be questioned; (2) the judge has a personal bias or prejudice concerning the subject matter or a party; (3) the judge has personal knowledge of disputed evidentiary facts concerning the proceeding; (4) the judge or a lawyer with whom the judge previously practiced law has been a material witness concerning the proceeding; (5) the judge participated as counsel, adviser, or material witness in the matter in controversy, or expressed an opinion concerning the merits of it, while acting as an attorney in government service; (6) the judge knows that the judge, individually or as a fiduciary, or the judge's spouse or minor child residing in the judge's household, has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding; (7) the judge or the judge's spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person is a party to the proceeding or an officer, director, or trustee of a party; is known by the judge to have an interest that could be substantially affected by the outcome of the proceeding; or is to the judge's knowledge likely to be a material witness in the proceeding; or (8) the judge or the judge's spouse, or a person within the first degree of relationship to either of them, or the spouse of such a person, is acting as a lawyer in the proceeding. Tex. R. Civ. P. 18b(b). The standard

5

for recusal on an assertion of bias is whether a reasonable person in the community would believe that the judge's recusal is required, and when a request for recusal is based on a trial judge's alleged bias, the bias must be extrajudicial and not based on in-court rulings. *In re P.M.*, No. 02-14-00205-CV, 2014 WL 8097064, at *31 (Tex. App.—Fort Worth Dec. 31, 2014, pet. denied) (mem. op. on reh'g).

As the United States Supreme Court has explained, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion," and opinions that a judge forms during a trial do not necessitate recusal "unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 240 (Tex. 2001) (quoting *Liteky v. United States*, 510 U.S. 540, 555, 114 S. Ct. 1147, 1157 (1994)). "Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge," although "[t]hey *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky*, 510 U.S. at 555, 114 S. Ct. at 1157. However, expressions of impatience, dissatisfaction, annoyance, and even anger that are within the bounds of what imperfect men and women sometimes display do not establish bias or partiality, and a judge's ordinary efforts at courtroom administration remain immune. *Id.* at 555–56, 114 S. Ct. at 1157. In *Liteky*, the United States Supreme Court held that judicial rulings, routine trial administration

6

efforts, and ordinary admonishments—whether or not legally supportable—to counsel and to witnesses that occur in the course of judicial proceedings and neither (1) rely upon knowledge acquired outside such proceedings nor (2) display deep-seated and unequivocal antagonism that would render fair judgment impossible are inadequate grounds to support recusal. *Id.* at 556, 114 S. Ct. at 1158.

If a motion to recuse does not comply with the requirements of Rule of Civil Procedure 18a, it may be denied without an oral hearing but must state the nature of the noncompliance. Tex. R. Civ. P. 18a(g)(3)(A).

Father filed a motion to recuse on January 4, 2019. In his motion, he complained, as he does on appeal, that the trial judge did not rule on or respond to anything that he filed[6] and that the trial judge was biased in favor of T.S. because he

---

[6]In contrast to Father's assertion that the trial court did not make any rulings in his favor, the record affirmatively demonstrates that the trial court ruled in his favor with regard to his request for a bench warrant so that he could participate in the termination trial. The record also reflects that the trial court granted permission to Father to participate in hearings by telephone and made arrangements for him to be able to do so. And during the trial, the trial judge indicated that he was aware that Father had been writing to the court, explaining,

> THE COURT: All right. While I'm thinking about it, you were the one that was writing me every week?
>
> [Father]: Yes, sir.
>
> THE COURT: You can't write to me directly. So I can't. It's called ex parte. So I never answered you. I just heard that you were writing but I couldn't. Just so you know[.]
>
> . . . .

7

had ruled in her favor, noting particularly T.S.'s motion to consolidate that was ruled on and granted "one (1) day after it was filed,"[7] and because the trial judge had allowed "presumed Ex Parte statements." The trial judge declined to recuse and referred the matter to the Presiding Judge of the Eighth Administrative Judicial Region to decide the motion.

The presiding judge denied the motion on January 23, 2019, without a hearing, stating that Father's motion had failed to meet the requirements set forth in Texas Rule of Civil Procedure 18a. In the order, the presiding judge explained that "[a] recitation of adverse rulings and a conclusory statement that the adverse ruling show[s] bias is legally insufficient to meet the requirements of a motion to recuse." *See id.* Because the denial of Father's motion to recuse does not reflect an abuse of discretion but rather demonstrates that the presiding judge followed the requirements of the Texas Rules of Civil Procedure applicable to motions to recuse, we overrule this issue. *See* Tex. R. Civ. P. 18a(j)(1)(A).

---

[Father]: I was just anxious, sir. I don't want to lose rights to my son.

[7]On May 8, 2018, T.S. filed her original petition to terminate the parent–child relationship in cause number 233-640398-18. On September 10, 2018, she filed a motion to consolidate cause number 233-640398-18 into cause number 231-601747-16, the earlier case involving a petition for the conservatorship of G.S., because the lawsuits involved a common question of law or of fact and consolidation would help avoid unnecessary expense and delay. The trial court granted the motion to consolidate on September 11, 2018.

### III. Termination of Parental Rights

For a trial court to terminate a parent–child relationship, the party seeking termination must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy at least one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

### A. Standards of Review

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that T.S. proved that Father's rights should be terminated under Section 161.001(b)(1)(A) or (Q) and that the termination of the parent–child relationship was in G.S.'s best interest. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19. But if a factfinder reasonably could not—because the disputed evidence that could not reasonably support the finding is too significant—then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## B. Family Code Section 161.001(b)(1)(Q)

Section 161.001(b)(1)(Q) provides that a trial court may terminate parental rights if the parent knowingly engaged in criminal conduct that resulted in the parent's conviction and "confinement or imprisonment and inability to care for the child for not less than two years from the date of filing the petition." Tex. Fam. Code Ann. § 161.001(b)(1)(Q). We read Subsection Q prospectively, focusing on the parent's future imprisonment and inability to care for the child, to ensure that the child will

10

not be neglected while the parent serves his sentence and is unable to provide for his child during that time. *In re A.V.*, 113 S.W.3d 355, 360–61 (Tex. 2003) ("By looking at future imprisonment and inability to care for the child, [S]ubsection Q purports to protect children whose parents will be incarcerated for periods exceeding two years after termination proceedings begin."). In some cases, neither the length of the sentence nor the projected release date is dispositive of when the parent will in fact be released from prison, and evidence of parole is relevant to this issue, but "[m]ere introduction of parole-related evidence . . . does not prevent a factfinder from forming a firm conviction or belief that the parent will remain incarcerated for at least two years [because p]arole decisions are inherently speculative." *H.R.M.*, 209 S.W.3d at 108–09 (noting that the jury considered the father's testimony about the possibility of parole as well as his criminal record of multiple convictions and sentences and his twice having been already denied parole during his current incarceration).

Further, Subsection Q requires finding both that the parent is incarcerated *and* that he is unable to care for the child for at least two years from the date the petition was filed. *Id.* at 110. Absent evidence that a non-incarcerated parent (or other person) has agreed to provide support for the child *on the incarcerated parent's behalf*, merely leaving a child with a non-incarcerated parent does not constitute the ability to provide care. *Id.* In *H.R.M.*, the evidence showed that the incarcerated father had not financially provided for the child following his divorce from the child's mother and that no one had testified to a willingness to care for the child on the father's behalf

11

during his incarceration; the court held that his obligations to care for the child were not satisfied by merely allowing the child's sole managing conservator to be the child's exclusive caregiver. *Id.*

In February 2016, Father pleaded guilty to an aggravated robbery alleged to have occurred on May 26, 2015, in exchange for ten years' confinement. T.S. filed the petition to terminate Father's parental rights on May 8, 2018. Accordingly, to support the termination of Father's parental rights under Subsection Q, the evidence had to show by clear and convincing evidence that Father would be confined and unable to care for G.S. until at least May 8, 2020.

At the September 11, 2019 bench trial, the trial court admitted into evidence Father's offender information details from the Texas Department of Criminal Justice, which showed that his maximum sentence date was July 23, 2025, and that he would not be eligible for parole until July 23, 2020. G.S. was three years old at the time of the trial; by July 23, 2025, G.S. would be nine years old.

T.S. testified that since receiving sole managing conservatorship of G.S. in 2017, she had received no financial support from Father or his extended family but acknowledged that Father had once asked a friend to wire some money when G.S. was an infant and that Father's brother had brought formula for the child a couple of times right after he was born. On cross-examination, T.S. agreed that she had not asked for child support from Father.

Father testified that he wrote to G.S. every week, sent him gifts, and did "everything [he] possibly" could from prison,[8] but he also acknowledged that he was not in a position to support the child, stating, "I can't support him because I'm in prison. I mean, I do what I can. I can have family help. I can have friends help when I can, but . . . I can't support him. I'm in prison right now." Father listed his job qualifications and prospects—a GED, experience doing HVAC work, a strong work ethic, and college coursework—that he would use after he finished serving his time, but he acknowledged that his record "reflect[ed] that [he] ha[d] a tendency to make poor choices."[9] Father acknowledged that seven months was the longest period he had not been incarcerated during his adult life, and he agreed that it was not in G.S.'s best interest for G.S.'s life to be put on hold while waiting to see if Father could make good decisions. Father's brother acknowledged that Father was not financially able to support G.S. while incarcerated.

---

[8]T.S. acknowledged that Father wrote G.S. every week and sent him coloring books for his birthday.

[9]The trial court admitted into evidence Father's prior convictions from 2002 onward. On October 9, 2002, Father pleaded guilty to a September 8, 2002 theft-of-a-vehicle offense in exchange for 12 months' confinement in state jail, to be served concurrently with his six-month sentence for a February 1, 2002 theft-of-a-vehicle offense and his twelve-month sentence for a February 14, 2002 evading-arrest-or-detention-with-a-vehicle offense that occurred upon the revocation of his community supervision. On March 10, 2004, Father pleaded guilty to a December 16, 2003 forgery offense and a December 16, 2003 tampering-with-governmental-record (counterfeit driver's license) offense in exchange for three years' confinement. On October 9, 2006, Father pleaded guilty to a March 20, 2006 delivery of a controlled substance (methamphetamine) offense in exchange for 15 years' confinement.

13

Viewed in the light most favorable to the trial court's finding, we conclude that a reasonable factfinder could have formed a firm belief or conviction that Father, who pleaded guilty, knowingly engaged in the criminal conduct that resulted in his conviction and confinement, that the duration of his confinement was for more than two years from the date T.S. filed the petition, and that Father was unable to care for G.S. during that time. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(Q); *J.P.B.*, 180 S.W.3d at 573. Accordingly, the evidence is legally sufficient to support the trial court's Subsection Q finding. And based on the evidence and giving due deference to the factfinder's findings, we conclude that the evidence is likewise factually sufficient to support the trial court's Subsection Q finding. *See H.R.M.*, 209 S.W.3d at 108; *C.H.*, 89 S.W.3d at 18–19. We overrule this issue.

## C. Best Interest

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the

14

evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

(A)     the [child's] desires . . . ;

(B)     the [child's] emotional and physical needs[,] . . . now and in the future;

(C)     the emotional and physical danger to the child now and in the future;

(D)     the parental abilities of the individuals seeking custody;

(E)     the programs available to assist these individuals to promote the [child's] best interest . . . ;

(F)     the plans for the child by these individuals or[, if applicable,] by the agency seeking custody;

(G)     the stability of the home or proposed placement;

(H)     the [parent's] acts or omissions . . . indicat[ing] that the existing parent–child relationship is not a proper one; and

(I)     any excuse for the [parent's] acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

15

T.S., who had worked for the same employer for 17 years, had taken care of G.S. since his birth, and he had lived his entire life with her and his half-brother J.S. in her two-bedroom, two-bathroom apartment. They saw T.S.'s parents at least once a week, and the children called them "nana" and "papa."

T.S. said that G.S. had been learning to recognize his name in preschool and had been upset that his last name was different from hers and his brother's. T.S. stated that DFPS told her that she needed to obtain legal guardianship so that she could make decisions for G.S., and she said that if the trial court approved the termination, she planned to file a petition for adoption as soon as possible. She wanted to adopt G.S. so that she could be his legal mother and give him the security of a permanent family. She sought to terminate Father's parental rights to G.S. "based on what's best for [G.S.]. What's best for [G.S.] is to have a stable, legal parent."

T.S. stated that she believed in open adoption, so both children knew their biological mother, and G.S. knew Father was his biological father. Father had met G.S. twice, once right after G.S.'s first birthday and then a few months after that on Father's Day in 2017. T.S. had also set up a Facebook page for the children, to update their biological families through photographs and to keep in contact with them. During the past year, she had sent Father updates on G.S. when something important happened, Father's brother and sister-in-law had attended G.S.'s birthday parties, and she believed it was in G.S.'s best interest to know Father's family. She

16

had taken G.S. to visit Father twice but did not feel that continuing visits to the prison

would be in G.S.'s best interest.[10]

Father testified,

> . . . I want my son to stay with [T.S.]. She's a great mother to him.
> She's good to my son. He loves her, but I understand her fear of me
> getting out of prison and trying to get him and come stay with me and
> my poor choices could put fear in her, but that's a bad decision of [G.S.],
> but I have no intention of taking my son from her. He's with her. He's
> with his half brother. He loves his brother. He loves her. Her family is
> good to him. My family is good to him, but I don't want to lose my
> rights just because of a poor decision I made before he was ever even
> conceived. You know, I mean, I'm in prison. I haven't made the best
> choices. That's obvious. But I don't feel like my rights have -- I don't
> feel like I've done anything to deserve that.

And during cross-examination, Father stated the following,

> Q. Do you feel that [G.S.] is safe with [T.S.]?
>
> A. Yes, ma'am.
>
> Q. Do you feel that she provides stability for [G.S.]?
>
> A. Yes, ma'am.
>
> Q. Do you think [G.S.] is happy with [T.S.]?
>
> A. Yes, ma'am.
>
> Q. You think he's healthy with [T.S.]?
>
> A. Yes, ma'am.

---

[10]The trial judge asked T.S. why she had taken the child to the prison, and she explained that at the time she did not want Father to be a stranger to G.S. Since then, however, she had realized that a prison was not the best environment for G.S. to see.

Q. And [T.S.] keeps you pretty well updated about [G.S.], doesn't she?

A. I would like it more frequently but, yes, she does.

Q. And other than not bringing [G.S.] to the prison every 90 days, has [T.S.] done everything she said she would do?

A. Yes, ma'am.

Q. And can we agree that it's in [G.S.'s] best interest for him to have stability?

A. Yes, ma'am.

Q. And just to be clear, you do believe it's in [G.S.'s] best interest to be with [T.S.], correct?

A. Yes.

Father testified that he had not had the opportunity to prove to himself that he could be a good father and that he wanted that opportunity. He said that if his rights were not terminated, then upon his release from prison he planned to get a job and work out visitation and that he was willing to take random drug tests and pay child support and "do what [he] need[ed] to do to show [T.S.] that [he] can be a good dad to [G.S.]" so that he could work his way up to weekend visits, holiday visits, and summer vacation. He said that he had no intention of taking G.S. away from T.S. And he acknowledged during cross-examination that visiting a parent in jail was not in

G.S.'s best interest although that had been a point of contention between him and T.S.[11]

Father's brother testified that it was not in G.S.'s best interest to terminate Father's parental rights and that Father would be a good father to G.S. once he was released from prison, but he agreed that T.S. was good for G.S.

A childcare worker who had known T.S. for ten years and who had taken care of G.S. at daycare since he was three months old testified that T.S. was "an amazing mom. She's caring and loving. She puts her kids first." She described G.S. and his half-brother as happy, healthy, and clean, and she stated, "If I could have all my parents be like [T.S.], it would be wonderful." She said that G.S. would have a great family and great support system if T.S. adopted him. Two photographs of G.S. with his half-brother were admitted into evidence. Both photographs show happy, healthy children, and in one of the photographs, G.S. is wearing a t-shirt that says "Best Little Brother in the World."

G.S.'s ad litem pointed out to the trial court that while Father testified that he had no intention of taking G.S. away from T.S. at the present time, "any of this stuff is open to modification at any time so when he says that, he may not right now have an intention, but we do know that that door is always open." She was concerned

---

[11]As part of the October 16, 2017 agreed order between T.S. and G.S.'s biological parents, T.S. was supposed to bring G.S. to the correctional facility every three months. In 2018, Father sued T.S. for breach of contract after she decided that the visits were not in G.S.'s best interest.

about stability for G.S., and so she supported termination of Father's parental rights because of T.S.'s "willingness to be open with parents, even after termination," as she had already shown with G.S.'s half-brother.

Given the child-centered focus of the best-interest determination, we conclude that the evidence is legally and factually sufficient to support the trial court's finding. Although G.S. was only three years old, he was already cognizant of the fact that T.S. and his half-brother had a different last name, and T.S. is the only parent that he had ever known although he had also met his biological mother and had received gifts and letters from Father. No one disputed that T.S.'s parenting abilities were excellent or that her home was a stable and healthy one, and she had maintained G.S.'s connection with his paternal biological family. Father's principle argument for retaining his rights was that he deserved the opportunity to prove that he could be a good parent,[12] but based on his criminal record and his earlier insistence on G.S.'s visiting the prison, the trial court could have reasonably formed a firm belief or conviction that terminating Father's parental rights in order to provide G.S. with emotional and physical safety and stability was in the child's best interest.

As we have previously noted in termination-of-parental-rights cases, "[u]nder our current statutory scheme, as between a parent and a child, only one may prevail:

---

[12]Father's closing argument was, "I don't believe I've done anything to have my rights terminated. You know, just based off of my poor choices in the past, doesn't mean I'm going to make poor choices in the future."

20

the child." *See In re J.P.-L.*, 592 S.W.3d 559, 562 (Tex. App.—Fort Worth 2019, pet. denied) (citing Tex. Fam. Code Ann. § 153.002 ("The best interest of the child shall *always* be the *primary* consideration of the court in determining the issues of conservatorship and possession of and access to the child." (emphasis added))); *see also In re K.C.*, No. 02-19-00293-CV, 2020 WL 370573, at *8 (Tex. App.—Fort Worth Jan. 23, 2020, no pet. h.) (mem. op.) (holding evidence sufficient to support best interest finding when it showed that it would not be in the child's best interest to deprive her of a stable, loving, permanent family for several years "based on the mere possibility that Father will be able to establish a healthy relationship with [her] from prison and thereafter apply the skills he has learned upon his release, without subjecting her and her potential adoptive family to undue fear that he will disrupt" her relationship with them). Accordingly, because the evidence is legally and factually sufficient to support the trial court's best interest finding, we overrule this issue.

## IV. Conclusion

Having overruled Father's issues, we affirm the trial court's judgment.

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Delivered: March 19, 2020

21